# United States Court of Appeals
## For the First Circuit

No. 07-2113

SOPHEAP SOK,

Petitioner,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lynch, <u>Circuit Judges</u>,
and Tashima,<sup>*</sup> <u>Senior Circuit Judge</u>.

<u>Joseph A. MacDonald</u>, on brief for petitioner.
<u>Joan H. Hogan</u>, Attorney, U.S. Department of Justice, Civil
Division, Office of Immigration Litigation, <u>Jeffrey S. Bucholtz</u>,
Acting Assistant Attorney General, Civil Division, and <u>Linda S.
Wendtland</u>, Assistant Director, on brief for respondent.

May 22, 2008

---

<sup>*</sup> Of the Ninth Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  Sopheap Sok overstayed her visitor's visa to the United States.  More than one year after entry, she applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), alleging that she had suffered persecution in her native Cambodia and feared future persecution on account of her political beliefs.  The immigration judge ("IJ") dismissed her asylum claim as untimely, and denied the withholding and CAT claims on the merits.  The Board of Immigration Appeals ("BIA") affirmed and ordered Sok removed.  Sok now petitions this court for review of the denial of her withholding and CAT claims.  We deny her petition with respect to the CAT claim.  However, because the BIA and IJ gave a legally insufficient explanation of why Sok failed to prove that she suffered past persecution in Cambodia, we grant the petition with respect to the withholding claim, vacate the BIA's order of removal, and remand the case for further proceedings.

## I.  Background

We summarize the evidence as Sok presented it to the IJ in her hearing testimony and in the affidavit accompanying her asylum application; we then consider the IJ's and BIA's findings in relation to that evidence.  Mihaylov v. Ashcroft, 379 F.3d 15, 18 (1st Cir. 2004); see also  Mukamusoni v. Ashcroft, 390 F.3d 110, 121 (1st Cir. 2004) (information in asylum application affidavit may be used to satisfy burden of proof in removal proceedings).

-2-

In 1995, Sok and her husband, Ratha Chhin, became members of the Khmer National Party ("KNP"). The KNP, which later changed its name to the Sam Rainsy Party ("SRP"), is a political rival to the Cambodian People's Party ("CPP") headed by Hun Sen. From the beginning of their affiliation with the KNP/SRP, Sok and Chhin campaigned actively on behalf of the party. In January 1996, they received a letter telling them they would have a "a big problem" if they continued to support the KNP. In May 1996, graffiti was painted on their house stating, "Your life as being a traitor will not be easy if you help the Sam Rainsy against the CPP."

In early July 1997, Sok, Chhin, and their children fled their home for a town on the Thai border a day before Hun Sen attempted to take control of the government in a coup. The family returned some five months later and found that their house had been burglarized.

In May 1998, SRP leader Sam Rainsy appointed Chhin as chief of the SRP electoral committee in the Phsar Depo quarter of Phnom Penh. Two weeks later, a police lieutenant named Khy Kok went to Sok's house and warned Chhin that he must stop supporting the SRP, or he would kill or harm Chhin's family. Lieutenant Kok also threatened Sok directly, telling her, "[I]f you do not listen to me, I will destroy you."

In July 1998, Hun Sen and the CPP won the national elections. The SRP and another opposition party claimed fraud. In

-3-

September 1998, Chhin led some 300 people in a public rally to protest the election results. They were met in a public square by soldiers with fire trucks, who sprayed them with wastewater and beat many of them, including Chhin. Sok witnessed the soldiers beating her husband; his nose was bloody and he had been handcuffed. When she attempted to help him, a soldier grabbed her by the hair and pulled her back, and then began beating her on the leg and shoulder until she fell unconscious. When she regained consciousness, she found herself in jail and in pain from the blows the soldiers had dealt her. During her detention, she was given a cup of water and a handful of rice each day. Sok and Chhin were released three days later thanks to the efforts of human rights workers who intervened on their behalf. A private doctor treated Sok and Chhin for their injuries. Sok testified that she did not go to the hospital because she was afraid to go, as the public doctor there was part of the CPP government.

In January 2000, Sam Rainsy appointed Chhin to another SRP post in Phnom Penh. A week after his appointment, two unidentified men stopped Sok and Chhin on their motorcycle, pulled Chhin off, and kicked and punched him. Sok received some scratches when the motorcycle fell to the ground, and ran a short distance in an attempt to find help. She heard the men tell Chhin that if he did not stop supporting the SRP he would be dead. Sok stated that this incident "terrified [her] to death."

In May 2000 three policemen, led by Lieutenant Kok, went to Sok's house. When she answered the door, Kok put a gun to her neck and ordered her and her children into the bedroom and made them lie on the floor. While Kok stood watch at gunpoint, the other two men ransacked the house. After thirty minutes, one of the men said, "Let's go. I got it." The men took some documents, jewelry, and $2,000 cash. Before leaving, Kok warned Sok: "Anyone [who] acts against [the] CPP, his or her life will be in trouble." Following this incident, Sok urged Chhin to stop campaigning for the SRP; Chhin replied that he would continue to fight for democracy as long as he was alive. He told her that if she was afraid of dying, she could hide somewhere for her safety.

Prompted, according to Sok, by these repeated threats, she departed for the United States in July 2000, leaving Chhin, her two children, and sister behind. In November 2001, Sok's sister called to inform her that Hun Sen's men had arrested Chhin, and Chhin called some three weeks later to tell her he had been imprisoned for nineteen days on suspicion of being connected to the Cambodian Freedom Fighters. In February 2002, Sok's sister called to inform her that Chhin had been shot dead, along with some twenty others, and that their bodies were found under a bridge south of Phnom Penh. Her sister told Sok that Chhin was murdered for political reasons. Sok's two children have continued to live in Cambodia under her sister's care and with the assistance of

remittances sent from the United States by Sok, who is gainfully employed; the children are today seventeen and eighteen years old.

Sok filed for asylum, withholding of removal, and CAT protection on August 19, 2002.  On May 22, 2006, the IJ issued an oral decision denying Sok's application and ordering her removed.  He dismissed her asylum claim as untimely, and found that she had not demonstrated the requisite risk of torture for CAT protection.  Moreover, while the IJ found Sok generally credible, he concluded that her withholding claim also failed because the evidence presented did not show past persecution.  He gave the following explanation:

> The only time she was taken into custody was when she intervened at a demonstration wherein her husband was apparently being bullied and beaten by the police.  After that, she was released.
>
> The other events to which she testified had to do with having received threats.  Even in her affidavit in support of late filing, [Sok] says that she hoped to return at some point to reunite with her husband and two children.  Apparently, the events which had occurred to her were not sufficient to cause her to seek political asylum in the United States.

On only one issue -- the murder of Sok's husband Chhin -- the IJ found Sok's testimony "unreliable and unconvincing" because "this is the sort of evidence that is capable of being verified."  He elaborated:

> Is there no death certificate even though the body was cremated?  Could twenty people have been found murdered under a bridge or in a

pond and no police report was made? Is it that twenty people were found murdered under a bridge and there was no investigation? Remember now that the police might have been complicit in this, but still an investigation would have to be conducted even if there was a cover-up afterwards. . . . Is it there could be no newspaper report of this incident? Certainly, if twenty people are found murdered under a bridge, there had to be some newspaper report of this. . . . But this anecdotal hearsay testimony without corroboration is insufficient to prove the point.

The IJ then found that the evidence did not establish a likelihood that Sok would be persecuted if returned to Cambodia. He took account of a statement in the State Department's 2005 country report that there were no reported political killings in Cambodia in 2005; he also noted that Sok's children continue to live unharmed in Cambodia. The IJ accordingly denied Sok's application for withholding of removal.

The BIA adopted and affirmed the IJ's decision in its entirety. With respect to the withholding claim, the BIA added only that "[t]he harm [Sok] reported to have suffered while in Cambodia consisting of one arrest and several threats without more, is not deemed to rise to the level of persecution." We consider this to be a summary affirmance of the withholding ruling, and accordingly review the IJ's decision as if it were the BIA's. Molina de Massenet v. Gonzáles, 485 F.3d 661, 663 (1st Cir. 2007).

## II. Discussion

### A. Claim for CAT Relief

In her petition for judicial review of the BIA's decision, Sok makes no argument with respect to the CAT claim beyond an introductory assertion that "[t]he record establishes the merits of [her] claims for withholding of removal, and protection pursuant to the [CAT]." We accordingly deem this claim waived, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990), and review only the claim for withholding of removal.[1]

### B. Standard of Review and Law on Withholding of Removal

In evaluating the agency's denial of withholding of removal, "our review is aimed at determining whether the decision is supported by substantial evidence in the record." Halo v. Gonzáles, 419 F.3d 15, 18 (1st Cir. 2005). Under this standard, we will reverse only if the evidence in the record would compel a reasonable factfinder to reach a conclusion contrary to that of the agency. Hernández-Barrera v. Ashcroft, 373 F.3d 9, 20 (1st Cir. 2004). On the other hand, "'we may not affirm the [agency]'s decision when we cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency]'s view.'" Mukamusoni, 390 F.3d at

---

[1] Sok makes no mention at all of her asylum claim, or of a due-process claim she raised before the BIA, and as such we address neither.

119 (quoting Gailius v. I.N.S., 147 F.3d 34, 44 (1st Cir. 1998)) (internal quotation marks omitted). As a consequence, we must remand the case for further proceedings if the agency's decision "fails to state 'with sufficient particularity and clarity the reasons for denial of asylum' or otherwise to 'offer legally sufficient reasons for [the] decision.'" Mihaylov, 379 F.3d at 21 (quoting Gailius, 147 F.3d at 46-47); accord Halo, 419 F.3d at 18-19; Cordero-Trejo v. I.N.S., 40 F.3d 482, 487 (1st Cir. 1994) ("[D]eference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole, or are merely personal views of the immigration judge.") (citations omitted). Legal conclusions are reviewed de novo, with appropriate deference to the agency's interpretation of the governing statute in accordance with administrative law principles. Lin v. Mukasey, 521 F.3d 22, 26 (1st Cir. 2008).

In order to qualify for withholding of removal, Sok must show that, upon return to Cambodia, her life or freedom would be threatened based on a ground enumerated in the relevant statute; political opinion is one such ground. I.N.S. v. Aquirre-Aquirre, 526 U.S. 415, 419 (1999) (citing 8 U.S.C. § 1253(h)(1)). Sok can make this showing by establishing that, if returned to Cambodia, she will more likely than not be subjected to persecution because of her political opinion. Mewengkang v. Gonzáles, 486 F.3d 737,

-9-

741 (1st Cir. 2007). If Sok can demonstrate that she was persecuted in Cambodia in the past, moreover, the applicable regulation affords her a rebuttable presumption that she will likely be persecuted if sent back. Rotinsulu v. Mukasey, 515 F.3d 68, 71-72 (1st Cir. 2008) (citing 8 C.F.R. § 1208.16(b)(1)). The Government then bears the burden of rebutting the presumption through proof of either a fundamental change in circumstances eliminating the likelihood of persecution, or that Sok could avoid persecution by moving elsewhere in Cambodia. 8 C.F.R. § 208.13(b)(1)(i)(A)-(B); accord Rotinsulu, 515 F.3d at 72.

There is no single definition of "persecution." The term "encompasses more than threats to life or freedom, but less than mere harassment or annoyance. Between these broad margins, courts have tended to consider the subject on an ad hoc basis." Aguilar-Solís v. I.N.S., 168 F.3d 565, 570 (1st Cir. 1999) (citations omitted). "[P]ersecution always implies some connection to government action or inaction," Harutyunyan v. Gonzáles, 421 F.3d 64, 68 (1st Cir. 2005) (citation omitted), as when the harm suffered "is the direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct." Nikijuluw v. Gonzáles, 427 F.3d 115, 121 (1st Cir. 2005) (citation omitted).

With these principles in mind, we proceed to the merits of Sok's claim.

## C.  Past Persecution

As noted, a showing of past persecution would entitle Sok to a rebuttable presumption that she will likely face persecution if sent back to Cambodia.  Rotinsulu, 515 F.3d at 71-72.  With the exception of the evidence concerning Chhin's murder, the IJ found Sok to be credible, and we see no reason to disagree.  The IJ found, however, that she had not made the requisite showing of past persecution to trigger the presumption.  In drawing this conclusion, the IJ seems to have ignored certain pieces of critical evidence.

We count six separate instances in which Sok was either threatened with death or serious injury because of her KNP/SRP activities, was beaten and detained, or was with her husband when he was threatened or beaten:  (1) the January 1996 letter; (2) the May 1996 graffiti; (3) Lieutenant Kok's May 1998 death threat to Sok and Chhin; (4) the September 1998 beating and detention of Sok and Chhin; (5) the January 2000 beating of and death threat to Chhin by two unidentified men; and (6) Kok's May 2000 death threat to Sok.  With the exception of the September 1998 beating and detention, the IJ dismissed all these incidents summarily, deeming them "threats."[2]  He erred in so doing.

---

[2]  Sok also testified that her home was burglarized when she and her family fled to the Thai border for some months in 1997.  The IJ did not give individualized treatment to this incident either, but the record supports the conclusion that it was not persecution. Nothing in the record indicates that the burglary was motivated by

-11-

While the IJ need not address each and every piece of evidence put forth by a petitioner, he must at least "make findings, implicitly if not explicitly, on all grounds necessary for decision." Un v. Gonzáles, 415 F.3d 205, 209 (1st Cir. 2005) (citing Gailius, 147 F.3d at 44). This is especially true here: these six events, considered together, suggest a pattern of abuse directed at Sok beginning shortly after she became involved in the KNP/SRP. While "mistreatment ordinarily must entail more than sporadic abuse in order to constitute persecution," Bocova v. Gonzáles, 412 F.3d 257, 263 (1st Cir. 2005) (citation omitted), the mere fact that these events occurred over the course of four years does not automatically doom Sok's claim.

The most serious incident was Sok's beating at the September 1998 rally and subsequent three-day detention. Contrary to the IJ's suggestion, it is not inconceivable that such an episode might amount to persecution when considered together with other instances of threats and ill-treatment. See, e.g., Beskovic v. Gonzáles, 467 F.3d 223, 226 n.3 (2d Cir. 2006); Nakibuka v. Gonzáles, 421 F.3d 473, 477 (7th Cir. 2005); Guo v. Ashcroft, 361 F.3d 1194, 1203 (9th Cir. 2004). Sok was beaten severely enough

---

animus toward Sok or Chhin based on their political views; instead, it appears to have taken place during a time of general unrest, and at least one business in the neighborhood was also looted. See López de Hincapie v. Gonzáles, 494 F.3d 213, 219 (1st Cir. 2007) (no persecution where motive behind attack just as likely to have been pecuniary as based on a protected ground).

that she lost consciousness and did not regain it until she had already been taken from the square where the protest occurred and placed in a jail cell, and she required medical treatment for her injuries. Moreover, her assailants were soldiers -- by definition state agents -- and the attack took place in the course of a political rally protesting the government in power. These are all critical factors in a persecution analysis to which the IJ should have given discrete consideration.

With respect to the other incidents -- which the IJ dismissed as mere threats -- we have never suggested that threats cannot constitute persecution. On the contrary, we have often acknowledged that credible threats can, depending on the circumstances, amount to persecution, especially when the assailant threatens the petitioner with death, in person, and with a weapon. See, e.g., López de Hincapie v. Gonzáles, 494 F.3d 213, 217 (1st Cir. 2007); Some v. Gonzáles, 183 F. App'x 4, 7 (1st Cir. 2006); Un, 415 F.3d at 210. Sok testified that Lieutenant Kok entered her house on two separate occasions, pointed a gun directly at her, and threatened to kill her if she did not stop supporting the SRP. Of the various threats leveled at Sok from 1996 to 2000, the IJ should at least have addressed these two. See Berhe v. Gonzáles, 464 F.3d 74, 87 (1st Cir. 2006) ("Although [the IJ] 'need not spell out every last detail of [his] reasoning where the logical underpinnings are clear from the record,' there is a heightened

obligation 'to offer more explanation when the record suggests strong arguments for the petitioner that the [IJ] has not considered.'" (quoting Enwonwu v. Gonzáles, 438 F.3d 22, 35 (1st Cir. 2006))).  The IJ's silence on the matter is all the more troubling because Lieutenant Kok was a state agent.  These failures alone warrant a remand.  We note some additional concerns about the IJ's treatment of the evidence of the death of Sok's husband Chhin.

Sok testified that Chhin was murdered in early 2002 along with some twenty other persons, and that their bodies were left under a bridge south of Phnom Penh; she learned of this news through a telephone call from her sister.  If believed, this evidence could be a relevant factor in a properly performed evaluation of Sok's allegations of past persecution.  See In re H-, Applicant, 21 I. & N. Dec. 337, 345 (BIA 1996); see also, e.g., Halo, 419 F.3d at 19 (noting that political assassination of petitioner's uncle, to whom petitioner served as "right-hand man," might be a valid factor in determining whether petitioner was persecuted).  The IJ did not believe the evidence, however, deeming it "anecdotal hearsay testimony without corroboration."  He pointed specifically to three factors.  First, Sok did not produce a police report on the massacre.  The IJ expressed incredulity at the fact that some twenty people could be found murdered but the police launched no investigation and wrote up no report.  Second, Sok did not produce any newspaper reports on the massacre.  To this, the IJ

-14-

remarked, "[T]here had to be some newspaper report of this. If indeed it were political, one would imagine that the members of the opposition party would raise a ruckus about this and go to the newspapers or file a complaint or something." Third, Sok did not produce Chhin's death certificate. To this, the IJ stated, "Is there no death certificate even though the body was cremated?"

The IJ was required to provide a "specific, cogent, and supportable explanation" for his rejection of Sok's testimony as incredible. Heng v. Gonzáles, 493 F.3d 46, 48 (1st Cir. 2007) (citation omitted). He was not entitled to base this explanation on "inferences or presumptions that are not reasonably grounded in the record, viewed as a whole." Mukamusoni, 390 F.3d at 119; see also Hor v. Gonzáles, 421 F.3d 497, 500 (7th Cir. 2005) (adverse credibility finding cannot be based on conjecture about country conditions). Viewed as a whole, the record provides some support for Sok, and contains no evidence that the procedures the IJ assumed to exist in Cambodia are commonplace. On the contrary, the 2005 State Department country report in the record details police complicity in covering up extrajudicial killings of those disfavored by the CPP government and the muzzling of the media by the government. See U.S. Dep't of State, Country Reports on Human Rights Practices 2005: Cambodia § 2(a), available at http://www.state.gov/g/drl/rls/hrrpt/2005/61604.htm ("The media

increasingly practiced self-censorship due to fear of government reprisal.").

Although we need not decide this question ourselves, it may well be that Chhin and these twenty others were assassinated to eliminate them as political opponents. If such were the case, it is unsurprising that no death certificate was produced, no police report was drawn up, and no newspaper articles were published on the incident. Immigration judges must endeavor not to allow preconceptions garnered from life in the United States to color their evaluation of events that took place in foreign lands.[3] It is an unfortunate fact that, in many places in the world, the press is not yet free, and police and coroners, for one reason or another, do not always follow what we would regard as proper procedures. See Hor, 421 F.3d at 500. In short, we have doubts whether the IJ has provided a "specific, cogent, and supportable explanation" for his rejection of Sok's testimony on Chhin's murder. Heng, 493 F.3d at 48; see also Toloza-Jiménez v. Gonzáles,

---

[3] The IJ seems also to have been overly dismissive of the circumstances surrounding Chhin's nineteen-day detention a few months before his murder. Sok testified that Chhin called her after his release and said that the government had imprisoned him on accusations of being a member of the Cambodian Freedom Fighters. In response to this testimony, the IJ offered the following: "It is unclear to me what kind of treatment [Sok]'s husband received while he was in jail but the government of Cambodia certainly has a right to take into custody those who are thought to have been members of what is considered to be a terrorist organization." The IJ apparently gave no thought to the possibility -- quite plausible on these facts -- that Chhin's branding as a freedom fighter was a pretext for removing a political adversary from the public sphere.

-16-

457 F.3d 155, 159 (1st Cir. 2006) (adverse credibility finding resting on analysis of testimony, not on demeanor, entitled to "less than [the] usual deference").[4] We find nothing else in the record that would support an adverse credibility determination with respect to this testimony.

In sum, we think these various problems cast serious doubts on the IJ's finding that Sok failed to show past persecution, and as such it is not supported by substantial evidence in the record.

### D. Future Persecution

This conclusion makes it difficult for us to engage in meaningful review of the IJ's finding on future persecution. This is so because "'we do not know whether [Sok] should have had the benefit of the regulatory presumption . . . based on prior events.'" Hernández-Barrera, 373 F.3d at 23 (quoting El Moraghy v. Ashcroft, 331 F.3d 195, 204-05 (1st Cir. 2003)). If she did benefit from the presumption, the IJ should have made specific findings on whether the Government overcame the presumption in one of the two ways specified in the regulation: that a fundamental change in circumstances has removed the likelihood of future persecution, or that Sok could avoid persecution by moving

---

[4] Because Sok's application was filed before the REAL ID Act's effective date of May 11, 2005, the codification in that Act of the making and reviewing of credibility determinations, see 8 U.S.C. § 1158(b)(1)(B)(ii), does not apply to this case.

elsewhere in Cambodia. 8 C.F.R. § 1208.16(b)(1)(i)(A)-(B); see also Gailius, 147 F.3d at 44.

Despite this difficulty, we have acknowledged that there are some cases in which the agency's failure to properly analyze past persecution is harmless error because the record makes it abundantly clear that the petitioner will not likely suffer future persecution if sent back to her home country. In such a circumstance, we may affirm the agency's decision despite its flaws because the petitioner's claim is per se destined to fail, and to remand for further proceedings would therefore be futile. See Palma-Mazariegos v. Gonzáles, 428 F.3d 30, 35 (1st Cir. 2005) (distinguishing between cases in which "the issue of future persecution is [so] close [that] the allocation of burden of proof matters," and cases where "the issue of future persecution is so clear-cut that the allocation . . . does not matter," and holding that in the latter genre the Court of Appeals may affirm the agency's flawed decision despite the possible triggering of the regulatory presumption); Yatskin v. I.N.S., 255 F.3d 5, 10 (1st Cir. 2001) (similar). This, however, is not one of those cases.

The IJ based his finding that Sok had not shown likely future persecution on two factors. First, he observed that Sok's children have continued to live unharmed in Cambodia since she departed for the United States in 2000. We have often stated that a petitioner may have a weaker claim to future persecution when

-18-

family members continue to reside in the home country without incident. See, e.g., Boukhtouchen v. Gonzáles, 498 F.3d 78, 81 n.3 (1st Cir. 2007); Aquilar-Solís, 168 F.3d at 573. However, the fact that family members continue to reside unharmed in the home country may carry little evidentiary weight if they do not share the trait that made the petitioner a target of persecution. See Juan Li v. Gonzáles, 235 F. App'x 832, 834 (2d Cir. 2007) (citing Poradisova v. Gonzáles, 420 F.3d 70, 80 (2d Cir. 2005)); Kumar v. Gonzáles, 444 F.3d 1043, 1055 (9th Cir. 2006); Toure v. Att'y Gen. of U.S., 443 F.3d 310, 319 (3d Cir. 2006); Yang v. Gonzáles, 427 F.3d 1117, 1122 (8th Cir. 2005); Pena-Torres v. Gonzáles, 128 F. App'x 628, 632 (9th Cir. 2005). It is therefore difficult to conclude that Sok will not suffer future persecution from the mere fact that her teenage children living with other persons in Cambodia were unharmed, where they have no history of political involvement. The IJ should have acknowledged and addressed this possibility.

Second, the IJ cited a sentence in the State Department country report that, in 2005 "[u]nlike in 2004, there were no reported political killings" in Cambodia. U.S. Dep't of State, supra, Introduction. Recourse to the country report in evaluating future persecution was appropriate, see Gao v. Gonzáles, 467 F.3d 33, 37 (1st Cir. 2006), but the IJ erred in not adequately accounting for other portions of the report giving a less optimistic appraisal, such as the following:

> Nevertheless, the government's human rights record worsened, as the country's fragile democracy suffered several setbacks, particularly in the areas of political participation and freedom of speech. The government undertook actions that served to neutralize its critics through a limited number of arrests of journalists, leaders of civil society, human rights activists, and members of the political opposition.

U.S. Dep't of State, supra, Introduction. Moreover, while there were no reported political killings in 2005, the Department describes an atmosphere of extrajudicial killings and arbitrary detentions of perceived dissidents. It also relates that "[t]here were five killings of Sam Rainsy Party (SRP) activists during the year, but none were proven to be politically motivated." Id. § 1(a) (emphasis added).

As with past persecution, we do not decide today whether these and the other relevant facts in the record establish a likelihood that Sok will be persecuted if returned to Cambodia. Instead, we need merely determine whether the record makes it "so clear-cut" that she will not likely suffer persecution "that the allocation of the burden of proof does not matter." Palma-Mazariegos, 428 F.3d at 35. In light of what we have said above, the record in its current state makes it far from clear that Sok will likely be spared persecution.

### III. Conclusion

We conclude that the IJ's decision is not supported by substantial evidence in the record. At the same time, the record

does not compel us inexorably to the opposite conclusion -- that is, that Sok has definitively established withholding eligibility. Thus, because "[w]e cannot say the evidence compels a conclusion either way," El Moraghy, 331 F.3d at 205, we must remand to the agency to make a well-reasoned and well-explained determination of Sok's eligibility; this task may well require the presentation of additional evidence and further arguments by the parties. See Iao v. Gonzáles, 400 F.3d 530, 533 (7th Cir. 2005) (while entitlement to asylum "is a decision for the immigration authorities to make," a petitioner "is entitled to a rational analysis of the evidence by them"); accord Gailius, 147 F.3d at 47.

For these reasons, Sok's petition for review of her CAT claim is **denied**, but her petition for review of her withholding claim is **granted**, and the case is **remanded** for further proceedings consistent with this opinion. The BIA's order of removal is **vacated**.

**It is so ordered**.

-21-